# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

KURT M. ROTH,      )
                              )
       Plaintiff,       )
                              )
         v.             )    C.A. No. 2022-1192-LWW
                              )
SOTERA HEALTH COMPANY, a   )
Delaware corporation, SOTERA   )
HEALTH LLC (f/k/a Sterigenics   )
International, LLC), a Delaware   )
limited liability company,      )
                              )
       Defendants.     )

## MEMORANDUM OPINION

Date Submitted: June 27, 2024
Date Decided: September 23, 2024

John M. Seaman & G. Mason Thomson, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Ryan Q. Keech, K&L GATES LLP, Los Angeles, California; Matthew B. Goeller, K&L GATES LLP, Wilmington, Delaware; Carl Alan Roth, ROTH AMES LLP, La Habra, California; *Counsel for Plaintiff Kurt M. Roth*

John P. DiTomo, Lauren K. Neal, Courtney Kurz & Taylor A. Christensen, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Counsel for Defendants Sotera Health Company and Sotera Health LLC (f/k/a Sterigenics International, LLC)*

**WILL, Vice Chancellor**

Plaintiff Kurt M. Roth is a former officer of defendant Sotera Health Company's operating subsidiary. Sotera was a private equity-backed limited liability company when Roth became employed in 2015. Roth also joined the company as a member with equity including Class B-2 units. Under a limited liability company agreement, the Class B-2 units would vest if Sotera's private equity sponsors received cash distributions equal to a specified multiple of and return rate on their investment. The units would be forfeited if they remained unvested when Roth's employment ended.

In 2016, Sotera became a limited partnership. Its limited partnership agreement retained the same vesting and forfeiture terms for Class B-2 units that had previously applied. Sotera later became a public corporation, and Roth's units were exchanged for restricted shares of common stock. The restricted stock agreement he signed incorporates the limited partnership agreement's vesting and forfeiture terms for shares received in respect of Class B-2 units.

In 2022, Roth resigned after being offered a demotion. He was paid a significant sum for his vested equity. But he was told that the unvested restricted stock received in exchange for his Class B-2 units would be forfeited under the restricted stock agreement. He refused to sign a release of claims, which was a condition to receiving severance benefits under his employment agreement.

1

This lawsuit followed. Roth asks that the court award him the value of his equity and severance benefits based on claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and conversion. Sotera, however, insists that the shares were forfeited and that Roth is owed nothing.

In the following decision, I conclude that Sotera is entitled to summary judgment insofar as the restricted stock agreement incorporates the forfeiture and vesting terms applicable to Class B-2 units. I also conclude that Roth failed to satisfy a condition precedent to receiving severance benefits. I decline to grant summary judgment on whether the vesting threshold was met, which requires a factual determination. And I grant Sotera's motion for judgment on the pleadings regarding Roth's conversion and equitable accounting claims but deny it as to his breach of the implied covenant and declaratory judgment claims.

## I.  FACTUAL BACKGROUND

The following description is drawn from the undisputed facts in the pleadings and documentary exhibits submitted by the parties.[1]

_____

[1] Citations in the form of "Defs.' Opening Br. Ex. __" refer to exhibits to the Transmittal Affidavit of Courtney Kurz in Support of Opening Brief in Support of Defendants' Combined Motion for Summary Judgment and Judgment on the Pleadings (Dkts. 54-57). Citations in the form of "Pl.'s Answering Br. Ex. __" refer to exhibits to the Transmittal Declaration of G. Mason Thomson in Support of Plaintiff's Answering Brief in Opposition to Defendants' Combined Motion for Summary Judgment and Motion for Judgment on the Pleadings (Dkts. 149-51). Citations in the form of "Defs.' Reply Br. Ex. __" refer to exhibits to the Transmittal Affidavit of Courtney Kurz in Support of Defendants' Reply Brief in Further Support of Combined Motion for Summary Judgment and Motion for

## A.     Sotera and the Sponsors

Defendant Sotera Health Company is a publicly traded company that provides lab testing, sterilization, and advisory services for the global healthcare industry.[2] About 60% of Sotera's outstanding stock is owned by private equity firms GTCR LLC and Warburg Pincus LLC (collectively, the "Sponsors").[3]  GTCR's involvement with Sotera began in 2011, when it purchased the outstanding shares of Sotera's predecessor Sterigenics Holdings, Inc.[4]  In May 2015, GTCR sold part of its interest to Warburg Pincus.[5]

Following the partial sale to Warburg, the members of the new entity executed the Amended and Restated Limited Liability Company Operating Agreement of Sterigenics-Nordion Topco Parent, LLC (the "Topco Parent LLC Agreement"), which outlined the terms and benefits of several classes of equity that would be issued.[6]  Class A units were awarded to members who provided initial capital contributions and afforded each holder one vote in Board of Manager decisions and

---

Judgment on the Pleadings (Dkts. 161, 164).  Pin cites refer to internal pagination, except that documents without internal pagination are referred to by the last three digits of Bates stamps ('---).  Deposition transcripts are cited as "[Last Name] Dep."

[2] *See* Defs.' Opening Br. Ex. 1; Verified Compl. (Dkt. 1) ("Compl.") ¶ 1; Defs.' Answer to Verified Compl. (Dkt. 9) ("Answer") ¶ 1.

[3] *See* Defs.' Opening Br. Ex. 3; Compl. ¶ 21; Answer ¶ 21.

[4] Pl.'s Answering Br. Ex. 7; Pl.'s Opening Br. Ex. 12 at 13.

[5] Pl.'s Answering Br. Ex. 8.

[6] Defs.' Opening Br. Ex. 8 ("Topco Parent LLC Agreement").

priority with respect to distributions.[7] Class B units were granted as consideration for the provision of services and lacked voting rights.[8] Class B units were further divided into two sub-classes: Class B-1 units and Class B-2 units. The Class B-1 units were subject to time-based vesting over a five-year period.[9] The Class B-2 units were subject to performance-based vesting and would vest on the "Sponsors Inflow Trigger Date."[10]

The Topco Parent LLC Agreement used a series of embedded definitions to outline how Class B-2 units would vest. The Sponsors Inflow Trigger Date was defined, in relevant part, as "the date on which [] the Sponsors Inflows for each Sponsor through such date are at least two and one-half (2 ½) times the Sponsor Outflows for Sponsor through such date."[11] "Sponsor Inflows" means:

---

[7] *Id.* §§ 3.01(a), 4.01(a)(i), 3.10(a).

[8] *Id.* §§ 3.02(b), 3.10(a).

[9] *Id.* § 3.02(d)(i).

[10] *Id.* § 3.02(d)(ii).

[11] *Id.* § 1.01 ("'Sponsors Inflow Trigger Date' shall mean (A) until the second (2nd) anniversary of the Closing, the date on which (i) the Sponsor Inflows for each Sponsor through such date are at least two and one-half (2 ½) times the Sponsor Outflows for Sponsor through such date or (ii) the Sponsor Return for each Sponsor exceeds thirty percent (30%) and (B) after the second anniversary of the Closing, the first date on which (i) the Sponsor Inflows for such Sponsor through such date are at least two and one-half (2 ½) times the Sponsor Outflows for each Sponsor through such date and (ii) the Sponsor Return for each Sponsor exceeds twenty percent (20%)"); *see also id.* ("'Sponsor Return' means for each Sponsor, as of any measurement date, the annual interest rate (compounded annually) which, when used to calculate the net present value of all Sponsor Inflows and all Sponsor Outflows, causes such net present value amount to equal zero. The Sponsor[] Return shall be determined in good faith by the Board."). There is no dispute that the

4

with respect to each Sponsor, without duplication, as of any date, all cash payments by or on behalf of the Company (including distributions but excluding (a) Tax Distributions, (b) management fees, (c) expense reimbursements and (d) indemnification payments) received by such Sponsor with respect to or in exchange for Membership Units (whether such payments are received from the Company or any third party) from the Closing through the date of determination of the Sponsor Inflows.[12]

"Sponsor Outflows" means:

with respect to each Sponsor and without duplication, as of any date, all cash payments to or for the benefit of the Company (including Capital Contributions made and unreimbursed expenses incurred) by such Sponsors (on a cumulative basis) with respect to or in exchange for Membership Units (whether such payments are made to the Company or any third party) from the Closing until the date of determination of the Sponsor Outflows.[13]

"Membership Units" were defined to include "membership interests" in the company, including Class A and Class B units.[14] "Sponsor" referred to either affiliates of Warburg Pincus or of GTCR and "Sponsors" referred to both.[15]

---

Sponsor Return criteria was met at the time of Roth's departure. *See* Opening Br. in Support of Defs.' Combined Mot. for Summ. J. and J. on the Pleadings (Dkt. 53) ("Defs.' Opening Br.") 44 n.118.

[12] Topco Parent LLC Agreement § 1.01.

[13] *Id.*

[14] *Id.*

[15] *Id.*

## B. Roth's Hiring

In December 2015, Sterigenics International LLC hired plaintiff Kurt M. Roth for the position of Senior Vice President of Corporate Development and Strategy.[16] Soon after, he executed agreements setting the terms of his employment and compensation.

On February 24, 2016, Roth signed a Senior Management Agreement.[17] It confirmed that Roth's employment was terminable by either party with or without "Good Reason" or "Cause."[18] A "Separation" provision states:

> The Employment Period will continue until (1) Executive resigns his employment with or without Good Reason, (2) Executive's death or Disability or (3) the Board terminates Executive's employment with or without Cause.[19]

"Good Reason" is defined to include "any material reduction" in Roth's (1) title, status or authority, (2) responsibilities or assignment of duties inconsistent with his position, or (3) annual base salary or bonus.[20]

---

[16] Answer ¶ 24. Sterigenics International LLC later became known as defendant Sotera Health LLC, the operating entity for the Sotera companies. *See id.* ¶ 26.

[17] Pl.'s Answering Br. Ex. 19 ("Senior Management Agreement"); *see also* Answer ¶ 26.

[18] Senior Management Agreement § 1(c)(i).

[19] *Id.*

[20] *Id.* § 4. The fact that Roth later resigned under events constituting Good Reason is not in dispute.

The Senior Management Agreement also outlined severance benefits Roth could be entitled to upon resignation with Good Reason or termination "without Cause." It states:

> If Executive's employment is terminated by the Board without Cause or by Executive with Good Reason, in either case, then during the Severance Period [of 12 months following termination], the Company shall continue to pay to Executive his Annual Base Salary, payable in equal installments on the Company's regular salary payment dates as in effect on the date of termination . . . .[21]

The severance provision also provided for the reimbursement of COBRA insurance coverage premiums.[22] The payment of COBRA premiums and severance benefits was subject to Roth first executing and delivering to the company a general release in substantially the form of Exhibit A to the Senior Management Agreement.[23]

## C. Roth's B Unit Grant

After Roth was hired by Sterigenics International LLC, he became a Class B unit holder in its parent company Sterigenics-Nordion Topco Parent, LLC.[24] On February 29, 2016, Roth signed a notice (the "Grant Notice") acknowledging his receipt of Class B units and that the grant was made "subject to the terms and conditions . . . set forth in the [Topco Parent LLC Agreement] . . . as amended from

---

[21] *Id.* § 1(c)(i).

[22] *Id.*

[23] *Id.* § 1(c)(ii).

[24] Defs.' Answering Br. Ex. 20 ("Grant Notice").

7

time to time."[25] Roth's signature page to the Grant Notice confirmed that he "assent[ed] to the [Topco Parent LLC Agreement] . . . as amended or restated from time to time" and "agree[d] to become a party to the [Topco Parent] LLC Agreement and be bound by all of the applicable terms and provisions thereof."[26]

Roth was granted 4,106,278 Class B-1 units.[27] Of those Class B-1 units, 82% (3,384,295 units) were subject to a five-year time-based vesting schedule.[28] The remaining 18% (721,983 units) would vest 90 days after December 1, 2015.[29] There is no dispute that all of Roth's Class B-1 units have vested.[30]

Roth was also granted 2,481,816 Class B-2 units.[31] Of those Class B-2 units, 45.5% (1,128,098 units) vested as set out in the Topco Parent LLC Agreement ("Standard Class B-2 Units").[32] That is, the vesting of Roth's Standard Class B-2 Units was conditioned on the occurrence of the Sponsors Inflow Trigger Date— when the Sponsors received cash distributions (Sponsor Inflows) of at least 2.5 times

---

[25] *Id.* at '129.

[26] *Id.* at '132.

[27] *Id.* at '129.

[28] *Id.* at '130; *see* Topco Parent LLC Agreement § 3.02(d)(i).

[29] Grant Notice '130.

[30] *See* Def's Opening Br. 13.

[31] Grant Notice '129.

[32] *Id.* at '130; *see* Topco Parent LLC Agreement § 3.02(d)(ii).

8

their investment (Sponsor Outflows).[33]  The other 54.5% of Roth's Class B-2 units (1,353,718 units) were "[r]eturn-[b]ased" ("Super Class B-2 Units").[34]  The Super Class B-2 Units would only vest if the "Sponsor Inflows for each Sponsor . . . [we]re more than four (4) times the Sponsor Outflows for such Sponsor."[35]

All unvested equity would be forfeited and canceled for no consideration upon Roth's departure from the company.[36]

### D.    The Limited Partnership Conversion

After Roth joined the company, the Topco Parent LLC Agreement was amended twice more.[37]  No changes were made to the provisions governing the vesting and forfeiture of Class B-2 units.[38]

On October 31, 2016, Sterigenics-Nordion Topco Parent, LLC was converted into a Delaware limited partnership called Sotera Health Topco Parent, L.P. ("Topco Parent LP").[39]  Topco Parent LP was governed by a limited partnership agreement,

---

[33] Grant Notice '130; *see* Topco Parent LLC Agreement § 3.02(d)(ii).

[34] Grant Notice '130.

[35] *Id.*

[36] Topco Parent LLC Agreement § 3.03(a)(ii).

[37] Defs.' Opening Br. Exs. 10-11.

[38] *Compare* Defs.' Opening Br. Ex. 10 §§ 3.02(c) & 3.03, *with* Defs.' Opening Br. Ex. 11 §§ 3.02(c) & 3.03, *and* Topco Parent LLC Agreement §§ 3.02(d) & 3.03.

[39] Defs.' Opening Br. Ex. 12 (Certificate of Conversion); Defs. Opening Br. Ex. 13 (Certificate of Limited Partnership).  The limited partnership was formed as Sterigenics-Nordion Topco Parent, L.P. and changed its name to Sotera Health Topco Parent, L.P. Defs.' Opening Br. Ex. 14.

which was amended and restated several times.[40] It eventually came to be governed under an Amended and Restated Limited Partnership Agreement of Topco Parent LP dated June 30, 2020 (the "Topco Parent LP Agreement").[41]

The Topco Parent LP Agreement carried over the vesting terms attached to the limited liability company Class B-2 units. Like the Topco Parent LLC Agreement, the Topco Parent LP Agreement stated that "all outstanding Class B-2 units held by a Management Limited Partner will vest as of the Sponsors Inflow Trigger Date, if any, subject in all cases to such Management Limited Partner's continued Services through the Sponsors Inflow Trigger Date."[42] The vesting terms of the Topco Parent LP Agreement include the same definitions of the Sponsor Inflow Trigger Date, Sponsor Inflows, and Sponsor Outflows as the Topco Parent LLC Agreement.[43] Thus, as a Management Limited Partner, Roth's Class B-2 units remained subject to the same vesting conditions.[44]

---

[40] Defs.' Opening Br. Exs. 14-15. The first amendment was a global change replacing "Sterigenics-Nordion Topco Parent, L.P." with "Sotera Health Topco Parent, L.P." Defs.' Opening Br. Ex. 14. The second amendment changed the way tax distributions were made and updated the company's registered office and agent. Defs.' Opening Br. Ex. 15. Neither change is material to the present dispute.

[41] Defs.' Opening Br. Ex. 4 ("Topco Parent LP Agreement").

[42] *Compare* Topco Parent LP Agreement Ex. 4 § 3.02(c)(ii), *with* Topco Parent LLC Agreement § 3.02(d)(ii).

[43] *Compare* Topco Parent LP Agreement § 1.01, *with* Topco Parent LLC Agreement § 1.01.

[44] *See* Klaben Dep. 142.

Also like the Topco LLC Agreement, the Topco Parent LP Agreement provided that unvested equity would be forfeited if the grantee's employment with Topco Parent LP ceased before vesting.[45]

### E.     The Corporate Conversion

In November 2020, the company went public under the name Sotera Health Company. Topco Parent LP was concurrently dissolved.[46]

Topco Parent LP unit holders were advised that their units would be exchanged for an equivalent value of restricted shares of Sotera common stock, with each share valued at the initial public offering price.[47] Through the exchange, unit holders would become stockholders of Sotera and all outstanding limited partnership units would be canceled.[48] All Class B unit holders, including Roth, were required

---

[45] *Compare* Topco Parent LP Agreement § 3.03(a)(ii), *with* Topco Parent LLC Agreement § 3.03(a)(ii) (setting forward the same forfeiture condition).

[46] Technically, the entity that eventually went public was incorporated in Delaware in November 2017 as Sotera Health Topco, Inc. Defs.' Opening Br. Ex. 1 ("Prospectus") 11, 149, 151-52; *see infra* note 48.

[47] Defs.' Opening Br. Ex. 21 at 5.

[48] Defs.' Opening Br. Ex. 9 ("Restricted Stock Agreement") '273. To effectuate this exchange of Topco Parent LP units for Sotera stock, Topco Parent LP distributed its common stock in Sotera to the limited partners of Topco Parent LP pro rata in proportion to their partnership units. Through the distribution, the limited partners became stockholders of Sotera. Thereafter, Topco Parent LP was dissolved and wound up, and all outstanding limited partnership units (including the Class B Units) would cease to exist. Prospectus 140-41.

11

to sign a Restricted Stock Agreement.[49]  Roth "acknowledge[d] and accepte[d] the terms of th[e] [Restricted Stock Agreement]" by executing the signature page.[50]

The preamble to the Restricted Stock Agreement stated that "effective substantially concurrently with the time of effectiveness . . . the Partnership will distribute shares of Common Stock to the [limited partner] . . . with an equivalent value based on the IPO price."[51]  It further stated that "following th[is] [d]istribution . . . all of [the] [h]older's [u]nits will be cancelled for no consideration and the Partnership shall cease to exist."[52]

The Restricted Stock Agreement for each limited partner included a distribution schedule listing the limited partner's vested and unvested units by unit type as of the exchange.  Roth's Restricted Stock Agreement attached a distribution summary as Exhibit A.[53]  It indicated that Roth held 4,087,734 vested Class B-1 units and 18,544 unvested Class B-1 units.  He held 0 vested Class B-2 units and

---

[49] Prospectus 140 ("In addition, each holder of Class B Units who receives shares of our common stock in the corporate reorganization will be required to execute the Restricted Stock Agreement and Acknowledgment (the 'RSA') in the form filed as an exhibit to the registration statement of which this prospectus forms a part.").

[50] Restricted Stock Agreement '278.

[51] *Id*. at '273.

[52] *Id*.

[53] *Id*. at '281 (reflecting that Roth would receive 620,523 "Unvested Shares" of Sotera stock in exchange for his "Unvested" Class B-2 partnership units).

12

2,481,816 unvested Class B-2 units, which would be exchanged for 620,530 shares of Sotera stock and remain "[u]nvested."[54]

The Restricted Stock Agreement also explained that any shares of Sotera stock distributed in exchange for Class B-2 units would remain subject to the same vesting and forfeiture restrictions provided by the Topco Parent LP Agreement, as amended, and the Grant Notice.[55] It explained that, for unvested shares, the terms of the Topco Parent LP Agreement and Grant Notice were incorporated into the Restricted Stock Agreement.[56]

## F.    Roth's Resignation

On August 9, 2022, Roth was told that Sotera intended to demote him to "Leader of Sotera Health M&A."[57] Roth's salary would be cut by 21%, his target bonus reduced by 40%, and he would report to his replacement.[58] Roth rejected the offer and invoked a Good Reason resignation under the Senior Management Agreement.[59] Through counsel, Roth demanded that Sotera confirm either "the

---

[54] *Id.*

[55] *Id.* § 3(b).

[56] *Id.*; *see also* Prospectus 140 (disclosing that "the RSA generally provides that such shares shall be subject to the same vesting and forfeiture restrictions that applied to such unvested Class B-1 and Class B-2 Units prior to the distribution").

[57] Pl.'s Answering Br. Ex. 92.

[58] *Id.*

[59] Pl.'s Answering Br. Ex. 99. There is no dispute that Roth's resignation was for "Good Reason." *See* Defs.' Opening Br. 26.

immediate vesting of the entirety" of his unvested equity or that his unvested equity could be retained rather than forfeited upon his departure.[60]  In response, Sotera told Roth that if he left the company, he would "retain his approximately $20,000,000 of vested equity" but would "forfeit his unvested equity" under the Restricted Stock Agreement.[61]

On September 2, 2022, Sotera accepted Roth's Good Reason resignation and asked, pursuant to the Senior Management Agreement, that he execute a general release as a condition to his receipt of severance benefits and COBRA premiums.[62] The form of release provided by Sotera would have required Roth to acknowledge the forfeiture of unvested equity.[63]  He refused to sign any release.

### G.    This Litigation

On December 22, 2022, Roth filed a Verified Complaint against Sotera Health Company and Sotera Health LLC (together, "Sotera") concerning his entitlement to the unvested equity.[64]  He brought claims for breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), conversion

---

[60] Pl.'s Answering Br. Ex. 99; *see also* Pl.'s Answering Br. Ex. 89**.**

[61] Pl.'s Answering Br. Ex. 88.  The unvested equity was, according to Roth's counsel, worth "more than $12,000,000."  Pl.'s Answering Br. Ex. 99.

[62] Pl.'s Answering Br. Ex. 90; *see supra* notes 21-23 and accompanying text.

[63] Pl.'s Answering Br. Ex. 90.

[64] Dkt. 1.

(Count III), to compel an accounting (Count IV), and for declaratory judgment (Count V).[65]  Sotera answered the Complaint on March 10, 2023.[66]

A phased schedule was set so that Sotera could seek partial summary judgment on Roth's breach of contract claim.[67]  On August 18, 2023, Sotera filed an opening brief in support of its motion for partial summary judgment and a motion for partial judgment on the pleadings.[68]  On March 31, 2024, Roth filed an answering brief in opposition to the motions.[69]  On June 24, 2024, Sotera filed a reply brief in further support of their motions.[70]  Oral argument was held on July 8, 2024.[71]

## II.    LEGAL ANALYSIS

Sotera seeks summary judgment in its favor on Count I.  Under Court of Chancery Rule 56, summary judgment is granted only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[72]  "[T]he facts must be viewed in the light most favorable to the nonmoving party and the moving party has the burden of demonstrating that there is no material

---

[65] *Id.* ¶¶ 50-74.

[66] Dkt. 9.

[67] Dkt. 41.

[68] Dkt. 52.

[69] Dkt. 146.

[70] Dkt. 164.

[71] Dkts. 171, 174.

[72] Ct. Ch. R. 56(c).

question of fact."[73]   For the reasons explained below, I grant Sotera's summary judgment motion in part based on the terms of the Restricted Stock Agreement and Senior Management Agreement.  I deny it insofar as Sotera asks me to conclude that vesting criteria were unmet when Roth's employment ended.

Sotera also moves for judgment on the pleadings on Counts II through V under Rule 12(c).  The court may grant judgment on the pleadings "only when, accepting as true all of the nonmoving party's well-pleaded factual allegations, 'there is no material fact in dispute and the moving party is entitled to judgment as a matter of law.'"[74]  Although inferences must be drawn in favor of the non-movant, the court "need not blindly accept as true all allegations, nor must it draw all inferences . . . in [the non-movant's] favor unless they are reasonable inferences."[75]  As explained below, I dismiss Roth's conversion claim and his request for an accounting but reserve the other claims for trial.

### A.    Motion for Summary Judgment

In Count I, Roth claims that Sotera breached the Senior Management Agreement and Restricted Stock Agreement by refusing to properly calculate and

---

[73] *Senior Tour Players 207 Mgmt. Co. v. Golftown 207 Hldgs. Co.*, 853 A.2d 124, 126 (Del. Ch. 2004).

[74] *Interactive Corp. v. Vivendi Universal, S.A.*, 2004 WL 1572932, at *8 (Del. Ch. June 30, 2004) (citation omitted).

[75] *Id.* (citing *Werner v. Miller Tech. Mgmt., L.P.*, 831 A.2d 318, 327 (Del. Ch. 2003)).

recognize the vesting and non-forfeiture of his equity.[76]  He alleges that "all such conditions [to his receipt of equity] have been satisfied, including and without limitation (1) circumstances sufficient to trigger vesting and non-forfeiture; and (2) triggering transactions that occurred on or about November 24, 2020."[77]  He also asserts that Sotera breached the Senior Management Agreement by refusing to pay him severance benefits.[78]

Sotera makes three arguments in support of its motion for summary judgment on Count I.  First, it argues that the vesting and forfeiture terms of the restricted stock Roth received upon Sotera's IPO are identical to those governing the partnership Class B-2 units.  Second, if these vesting and forfeiture terms apply to Roth's restricted stock, it contends that Roth's units remained unvested at the time of his resignation.  Third, it asserts that the Senior Management Agreement precludes Roth from receiving severance benefits since he did not sign the required release.

Sotera's first and third arguments center on contract interpretation.  The Delaware Supreme Court "'has described pure matters of contractual interpretation as readily amenable to summary judgment,' because 'proper interpretation of

---

[76] Compl. ¶ 55.

[77] *Id.* ¶ 53.

[78] *Id.* ¶ 55.

17

language in a contract . . . is treated as a question of law.'"[79] "In cases involving questions of contract interpretation, . . . courts will grant summary judgment in two scenarios: (1) when the contract is unambiguous, or (2) when the extrinsic evidence fails to create a triable issue of material fact."[80] The movant may be entitled to summary judgment where its proffered construction is the only reasonable interpretation of a contract.[81]

I conclude that the relevant provisions of the Restricted Stock Agreement and the Senior Management Agreement are unambiguous and adopt Sotera's interpretation of those contracts. Under the Restricted Stock Agreement, the pre-IPO vesting and forfeiture terms apply to the restricted stock Roth received in exchange for his Class B-2 units. Under the Senior Management Agreement, Roth was required to sign a release as a condition to his receipt of severance benefits. He is not entitled to these severance benefits because he refused to do so. Summary judgment is granted for Sotera on these issues.

---

[79] *Tetragon Fin. Grp. Ltd. v. Ripple Labs Inc.*, 2021 WL 1053835, at *3 (Del. Ch. Mar. 19, 2021) (first quoting *Barton v. Club Ventures Invs. LLC*, 2013 WL 6072249, at *5 (Del. Ch. Nov. 7, 2013); and then quoting *Pellaton v. Bank of N.Y.*, 592 A.2d 473, 478 (Del. 1991)).

[80] *Julius v. Accurus Aerospace Corp.*, 2019 WL 5681610, at *7 (Del. Ch. Oct. 31, 2019), *aff'd*, 241 A.3d 220 (Del. 2020); *see GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 783 (Del. 2012) ("[I]n a dispute over the proper interpretation of a contract, summary judgment may not be awarded if the language is ambiguous and the moving party has failed to offer uncontested evidence as to the proper interpretation.").

[81] *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).

Sotera's second argument is less clear-cut. It requires a factual determination on whether the vesting conditions for Roth's restricted stock were satisfied as of his resignation in September 2022. According to Sotera, the vesting trigger was short by $94 million as evidenced by various financial statements, spreadsheets, and bank account statements.[82] Roth, for his part, refutes Sotera's calculation. He highlights various issues of material fact relevant to whether the Sponsor Inflows exceeded Sponsor Outflows by 2.5 times before Roth's departure. This matter must be resolved at trial.

### 1. Applicable Principles of Contract Interpretation

The standard rules of contract interpretation are well established under Delaware law, which governs the Restricted Stock Agreement and Senior Management Agreement.[83] "Delaware law adheres to the objective theory of contracts," meaning that "a contract's construction should be that which would be understood by an objective, reasonable third party."[84] "When interpreting a contract, [the] Court 'will give priority to the parties' intentions as reflected in the four corners of the agreement.'"[85] The court must construe the contract "as a whole and . . . will

---

[82] Defs.' Opening Br. 39-40.

[83] Restricted Stock Agreement § 10(f); Senior Management Agreement § 6(f).

[84] *Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

[85] *Id.* at 368 (quoting *GMG Cap. Invs., LLC*, 36 A.3d at 779).

give each provision and term effect, so as not to render any part of the contract mere surplusage."[86]

A court will not look beyond the four corners of an agreement if a contract is unambiguous.[87] Ambiguity exists if "the provisions in controversy are fairly susceptible of different interpretations."[88] "The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous. The determination of ambiguity lies within the sole province of the court."[89]

      2.     <u>The Restricted Stock Agreement's Vesting and Forfeiture Terms</u>

When Sotera's predecessor entity changed from a limited liability company to a limited partnership, the governing agreement was carefully revised. The Topco Parent LP Agreement delineated vesting and forfeiture criteria for partnership units, which were carried over from the Topco Parent LLC Agreement. Complete definitions for Sponsor Inflows, Sponsor Outflows, and the Sponsor Inflow Trigger

---

[86] *Osborn*, 991 A.2d at 1159 (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 2010 WL 779992, at *2 (Del. Mar. 8, 2010)).

[87] *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."); *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006) ("Clear and unambiguous language . . . should be given its ordinary and usual meaning.").

[88] *Eagle Indus.*, 702 A.2d at 1232.

[89] *Osborn*, 991 A.2d at 1160 (citation omitted).

Date matching those in the Topco Parent LLC Agreement were included in the Topco Parent LP Agreement.[90]

The Restricted Stock Agreement is less comprehensive. Regarding unvested shares, it simply incorporates the terms of the Topco Parent LP Agreement by reference.[91] Roth avers that this was the "drafting equivalent of duct tape and super glue," leaving Sotera unable to show that the vesting terms unambiguously apply to restricted stock.[92]

Sotera's drafting of the Restricted Stock Agreement is imperfect. For example, the Restricted Stock Agreement recognizes that by incorporating the Topco Parent LP Agreement, references to the "Partnership" would mean the "Company."[93] But it overlooked that other defined terms also became ill-fitting, such as "Management Limited Partner" and "Units." Still, sloppy drafting does not necessarily create ambiguity.

Sotera's intent in the Restricted Stock Agreement is apparent from its plain terms. The Restricted Stock Agreement explains that Roth was receiving both vested and unvested shares "as set forth on Schedule A."[94] Vested shares expressly

---

[90] *See supra* note 43.

[91] *See supra* note 56.

[92] Pl.'s Answering Br. 3.

[93] Restricted Stock Agreement § 3(b).

[94] *Id.* § 2(a).

lack "any vesting or forfeiture restrictions" after distribution.[95]  For unvested shares,

by contrast, the vesting and forfeiture conditions set out in the Topco Parent LP

Agreement apply.  Section 3(b) of the Restricted Stock Agreement states that:

> The Unvested Shares shall continue to be subject to the vesting
> and forfeiture terms and conditions set forth in Sections 3.02(c)
> and 3.03(a) of the [Topco Parent LP] Agreement (as modified, if
> at all, by the terms and conditions of Holder's Unit Grant Notice)
> to the same extent such terms and conditions would have applied
> to the unvested Class B Units with respect to which such
> Unvested shares were distributed and such terms and conditions
> ***are incorporated herein by reference as if fully set forth
> herein*** . . . .[96]

"As long as a contract 'refers to another instrument' and 'makes the conditions

of such other instrument a part of it, the two will be interpreted together as the

agreement of the parties.'"[97]  Here, the Restricted Stock Agreement specifically

---

[95] *Id.* § 3(a).

[96] *Id.* § 3(b) (emphasis added).

[97] *In re Nat'l Collegiate Student Loan Trusts Litig.*, 251 A.3d 116, 151 (Del. Ch. 2020) (quoting *Brastor Mercantile, Ltd. v. Central Citrus S/A*, 1989 WL 70971, at *4 (Del. Super. June 6, 1989); *see also Realty Growth Inv. Council of Unit Owners of Pilot Pointe*, 453 A.2d 450, 454 (Del. 1982) ("A contract can be created by reference to the terms of another instrument if a reading of all documents together gives evidence of the parties' intention and the other terms are clearly identified."); 17A C.J.S. *Contracts* § 419 (Westlaw, September 2024 Update) ("Matters incorporated by reference or annexed to a contract will be construed as part of the contract, for the purpose and to the extent indicated.");13 Williston on Contracts § 30:25 (4th ed.) (Westlaw, May 2024 Update) ("As long as the contract makes clear reference to the document and describes it in such terms that its identity may be ascertained beyond doubt, the parties to a contract may incorporate contractual terms by reference to a separate, non-contemporaneous document . . . .").

incorporates Sections 3.02(c) and 3.03(a) of the Topco Parent LP Agreement.[98] Roth had notice of and assented to these terms.

Section 3.02(c)(ii) of the Topco Parent LP Agreement set forth the vesting conditions for Roth's Standard Class B-2 Units. It provided that "[a]ll outstanding Class B-2 Units held by a Management Limited Partner will vest as of the Sponsors Inflow Trigger Date."[99] The Topco Parent LP Agreement defined "Sponsors Inflow Trigger Date," in relevant part, as "the first date on which [] the Sponsor Inflows for such Sponsor through such date are at least two and one-half (2 ½) times the Sponsor Outflows for each Sponsor through such date."[100] The Grant Notice, which modified the vesting criteria for Roth's Super Class B-2 Units, stated that the units would vest when the Sponsor Inflows reached four times the Sponsor Outflows.[101]

Section 3.03(a)(ii) of the Topco Parent LP Agreement addressed forfeiture for Roth's Class B-2 units. It provided that:

> In the event that a Management Limited Partner's Services terminate for any reason other than Cause on or following [May 15, 2016], all unvested Class B Units held by such Management Limited Partner as of such Management

---

[98] *Cf. Kerly v. Battaglia*, 1990 WL 199507, at *4 (Del. Super. Nov. 21, 1990) (noting that parties may limit the incorporation by reference of other agreements by designating "only certain provisions" of the other agreement to be incorporated into the contract at issue); Williston, *supra* note 97, § 30:25 ("It is not necessary to refer to or incorporate the entire document; if the parties so desire, they may incorporate a portion of the document.").

[99] Topco Parent LP Agreement § 3.02(c)(ii).

[100] *Id.* § 1.01; *see also supra* note 11 (full definition).

[101] Grant Notice '130.

Limited Partner's Management Termination Date ***shall be forfeited and cancelled for no consideration*** as of such Management Termination Date."[102]

These are the terms under which Roth accepted his Class B-2 limited liability company units, which carried forward in identical provisions in the Topco Parent LP Agreement. They continue to apply to Roth's unvested Sotera stock through a clear incorporation provision in the Restricted Stock Agreement.

Roth maintains that this incorporation fails under 8 *Del. C.* § 202(a) because the restrictions on his shares are not "contained in the notice or notices" provided with the stock grant.[103] Section 202(b), however, states that a restriction "may be imposed . . . by an agreement . . . among . . . security holders . . . and the corporation."[104] Further, Section 202(a) includes an exception for "persons with actual knowledge of the restriction."[105] Roth signed and consented to the Restricted Stock Agreement, which incorporates vesting and forfeiture provisions he had been

---

[102] Topco Parent LP Agreement § 3.03(a)(ii) (emphasis added). "Management Termination Date" was defined as "the date of [a] Management Limited Partner's termination of [s]ervices, as reasonably determined by the Board. *Id.* § 1.01.

[103] Pl.'s Answering Br. 48-49 (quoting 8 *Del. C.* § 202(a)).

[104] 8 *Del. C.* § 202(b).

[105] *Id.* § 202(a).

aware of since 2015.[106]   He understood how his units would be exchanged in an IPO.[107]

As noted above, I cannot say at this stage in the proceeding whether the Sponsors Inflow Trigger Date occurred.  But I can confirm as a matter of law that the vesting conditions applicable to Roth's Class B-2 units continued to apply to Roth's unvested restricted stock through Section 3(b) of the Restricted Stock Agreement.  If the associated shares were unvested when he left Sotera, they were "forfeited and cancelled for no consideration."[108]

3.      Severance Benefits Under the Senior Management Agreement

Section 1(c)(i) of the Senior Management Agreement explains that, upon resignation for Good Reason, Roth would be entitled to his annual base salary plus reimbursement for COBRA premiums for 12 months.[109]   Roth's receipt of these benefits was conditioned on his execution of a release.  Section 1(c)(ii) of the Senior Management Agreement states that "[Roth] shall not be entitled to receive any payments pursuant to this Section 1(c) unless [he] has executed and delivered to the Company a general release in substantially the form of Exhibit A attached

---

[106] *See* Restricted Stock Agreement § 10(a)(i).

[107] Defs.' Opening Br. Ex. 21; *see* Defs.' Opening Br. 67; Roth Dep. 228-29.

[108] Topco Parent LP Agreement § 3.03(a)(ii).

[109] Senior Management Agreement § 1(c)(i).

25

hereto (and such release is in full force and effect and has not been revoked within 60 days of Separation)."[110]

This language is unambiguous.[111] Executing a release in "substantially the form" attached to the Senior Management Agreement was a condition precedent to Roth receiving his severance benefits and COBRA premiums.[112] A condition precedent "must be performed or happen before a duty of immediate performance arises on the promise which the condition qualifies."[113] Because Roth declined to sign a release, he is not contractually entitled to the severance benefits and COBRA premiums contemplated by the Senior Management Agreement.

---

[110] *Id.* § 1(c)(ii).

[111] *See Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at \*25 (Del. Super. July 29, 2021) ("Although '[t]here are no particular words that must be used to create a condition precedent,' a condition precedent must be expressed clearly and unambiguously." (citation omitted)).

[112] The form of release provided to Roth upon resigning and the one attached as Exhibit A to the Senior Management Agreement differed in one notable way. The former contemplated that he would forfeit 15,649 restricted stock units, 61,853 stock options, and 620,523 unvested shares as a condition to receiving his severance benefits and COBRA premiums. The latter did not. *Compare* Pl.'s Answering Br. Ex. 90 at '3111, *with* Senior Management Agreement at '2965. Even if that difference caused Roth to balk, he did not propose or sign a version of the release tracking Exhibit A to the Senior Management Agreement.

[113] Williston, *supra* note 97, § 38:7 (4th ed.); *see also* Restatement (Second) of Contracts § 224 (Am. L. Inst. 1981) ("A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.").

## B. Motion for Judgment on the Pleadings

Roth brings four other claims against Sotera.[114] Sotera argues that each claim fails as a matter of law, entitling it to judgment on the pleadings. Two of the claims—for breach of the implied covenant of good faith and fair dealing and for a declaratory judgment—survive alongside the remainder of Count I. The other two claims—for conversion and for an accounting—are legally meritless.

### 1. Breach of Implied Covenant of Good Faith and Fair Dealing

"[A]n implied covenant of good faith and fair dealing inheres in every contract."[115] Delaware courts apply it only in "narrow circumstances."[116] A plaintiff "must allege: (1) a specific obligation implied in the contract; (2) a breach of that obligation; and (3) resulting damages."[117] An implied covenant claim will therefore succeed in only a relatively "narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and points to a result but does not speak directly enough to provide an explicit answer."[118]

---

[114] *See supra* note 65 and accompanying text.

[115] *Chamison v. HealthTrust, Inc.—The Hosp. Co.*, 735 A.2d 912, 920 (Del. Ch. 1999), *aff'd*, 748 A.2d 407 (Del. 2000).

[116] *Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1032 (Del. Ch. 2006); *Cincinnati SMSA, Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998) (explaining that application of the implied covenant "should be rare and fact-intensive, turning on issues of compelling fairness").

[117] *Metro Life. Ins. Co. v. Tremont Grp. Hldgs., Inc.*, 2012 WL 6632681, at *15 (Del. Ch. Dec. 20, 2012).

[118] *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009).

Roth alleges that Sotera breached the implied covenant of good faith and fair dealing in five ways, by:

> (1) maliciously or unreasonably causing a constructive termination of Mr. Roth in violation of the terms and conditions of his employment in an attempt to deprive him of Company equity, (2) denying Mr. Roth access to information necessary to determine the vesting status of his equity when such information is subject to the total control of the Company, (3) interpreting the ambiguous terms of Mr. Roth's equity award to unilaterally force non-vesting and forfeiture, (4) refusing and otherwise failing to calculate Sponsor Return on investment in good faith, and (5) demanding that Mr. Roth accept its conversion of his stock in order to receive benefits due to him under this Senior Management Agreement.[119]

Sotera argues that each theory fails as a matter of law because the relevant contracts leave no room for the implied covenant.

Sotera makes several persuasive arguments that put Roth's ability to prevail on this claim in doubt. The Senior Management Agreement contemplates a scenario where Roth is demoted and outlines the parties' rights, including giving Mr. Roth the option to accept the demotion or invoke a Good Reason resignation.[120] It also states that signing the release is a necessary condition for Roth to secure his severance benefits.[121] As to vesting and forfeiture, the Restricted Stock Agreement

---

[119] Compl. ¶ 61.

[120] Senior Management Agreement § 1(c)(i).

[121] *Id.* § 1(c)(ii); *see Edinburgh Holdings, Inc. v. Educ. Affs., Inc.*, 2018 WL 2727542, at *9 (Del. Ch. June 6, 2018) ("[I]f the contract at issue expressly

provides that Roth will forfeit his equity if he resigns before it vests.[122]  Roth's

argument about the Sponsor Return also seems irrelevant since the debate between

the parties turns on whether Sponsor Inflows exceeded Sponsor Outflows by 2.5 or

4 times—not on whether the Sponsor  Return of 20% was achieved.[123]  And the

Restricted Stock Agreement does not imply any information rights allowing Roth to

personally calculate the Sponsor Inflow Trigger Date.

More broadly, Delaware courts are hesitant to recognize the implied covenant

in the context of an at-will employment contract "out of a concern that the [c]ovenant

could thereby swallow the [employment at-will doctrine] and effectively end at-will

employment."[124]  But that is not always the case.  In *E.I. DuPont de Nemours & Co.

v. Pressman*, the Delaware Supreme Court recognized three exceptions: (1) where

an employer terminates an employee in violation of public policy;[125] (2) where an

---

addresses a particular matter, an implied covenant claim respecting that matter is duplicative and not viable.").

[122] Restricted Stock Agreement § 3(b).

[123] Defs.' Reply Br. 2 n.5 (noting that the "Sponsor Return" metric was "not at issue").

[124] *E.I. du Pont de Nemours & Co. v. Pressman*, 679 A.2d 436, 442 (Del. 1996).

[125] *Id.* at 441 (first citing *Monge v. Beebe Rubber Co.*, 316 A.2d 549 (N.H. 1974) (holding that an employer breached the implied covenant by terminating an employee for refusing sexual advances); then citing *Shearin v. E.F. Hutton Grp., Inc.*, 652 A.2d 578, 587-89 (Del. Ch. 1994) (finding a cause of action for breach of the implied covenant where a lawyer was fired for refusing to violate her ethical duties)).

29

employer misrepresents an important fact on which the employee relies;[126] or (3) where an employer "uses its 'superior bargaining power to deprive the employee of compensation that is clearly identifiable and is related to the employee's past services.'"[127]

Roth's argument touches on the third exception.[128] He alleges that Sotera's new CEO felt that Roth's equity package was excessive and manufactured reasons for his demotion to avoid paying him for it.[129] He also suggests that Sotera's Board took no efforts towards meeting the vesting conditions.[130] Despite the shakiness of Roth's claim, these facts support a reasonable inference that Sotera engaged in bad faith conduct to effect the forfeiture of Roth's equity.[131] Accordingly, Sotera's motion is denied under Rule 12(c).

---

[126] *Id.* at 440-41 (citing *Merrill v. Crothall-American, Inc.*, 606 A.2d 96 (Del. 1992) (finding an implied breach of a covenant where an employee was allowed to believe a job was for an indefinite term but subsequently produced evidence from which a rational jury could infer that his employer intended to replace him as soon as possible)).

[127] *Id.* at 441 (citing *Fortune v. National Cash Register Co.*, 364 N.E.2d 1251 (Mass. 1977) (explaining that a rational jury could find an implied breach of covenant where a commissioned salesman was terminated after securing a large sale but before he became entitled to the commission)).

[128] *See* Pl.'s Answering Br. 75-76

[129] *See, e.g.*, Compl. ¶¶ 4-8, 30, 48

[130] *See id.* ¶ 37.

[131] *Cf. Markow v. Synageva Biopharma Corp.*, 2016 WL 1613419, at *7-8 (Del. Super. Mar. 3, 2016) (holding that a former employee stated a claim for breach of the implied covenant where the employer's board unreasonably exercised discretion to avoid paying the employee more for stock options).

2. <u>Conversion</u>

A conversion claim requires a plaintiff to demonstrate that the defendant wrongfully deprived the plaintiff of property in which it held an interest or right of possession.[132] "A stockholder's shares are converted by any act of control or dominion without the stockholder's authority or consent and in disregard, violation, or denial of his rights as a stockholder of the company."[133] "A corporation itself may interfere with the rights of the stockholder by simply denying them, and thus become liable for conversion."[134]

Roth claims that Sotera improperly converted 620,523 shares of Sotera stock.[135] Whether these shares were wrongfully possessed by Sotera will be resolved through Counts I and II. Where a conversion claim is "based entirely upon a breach of the terms of a contract[, the plaintiff] generally must sue in contract, and not in

---

[132] *McGowan v. Ferro*, 859 A.2d 1012, 1040 (Del. Ch. 2004) ("Conversion is the 'act of dominion wrongfully exerted over the property of another, in denial of his right, or inconsistent with it.'" (quoting *Arnold v. Soc'y For Sav. Bancorp, Inc.*, 678 A.2d 533, 536 (Del. 1996))).

[133] *Arnold v. Soc'y For Sav. Bancorp, Inc.*, 678 A.2d 533, 536 (Del. 1996) (citation omitted).

[134] *Drug, Inc. v. Hunt*, 168 A. 87, 93 (Del. 1933).

[135] Compl. ¶¶ 64-65.

31

tort."[136]  "[A] plaintiff cannot bring a claim of conversion arising solely out of a breach of contract claim."[137]

Roth argues that he is "entitled an alternative means to prevail on tort and equitable claims" concerning the vesting and forfeiture conditions.[138]  But where a conversion claim arises from an enforceable contract, a theory sounding in tort is generally unavailable.[139]  Roth does not allege that any of the contracts are invalid or unenforceable.  Nor does he plead that Sotera owed him a duty outside of the relevant contracts.  Count III is therefore duplicative of his breach of contract and implied covenant claims.

### 3. Equitable Accounting

"An accounting is an equitable remedy that consists of the adjustment of accounts between parties and a rendering of a judgment for the amount ascertained

---

[136] *Data Mgmt. Internationalé, Inc. v. Saraga*, 2007 WL 2142848, at *3 (Del. Super. July 25, 2007).

[137] *Sheehan v. AssuredPartners, Inc.*, 2020 WL 2838575, at *14 (Del. Ch. May 29, 2020); *see also Midland Red Oak Realty, Inc. v. Friedman, Billings & Ramsey & Co.*, 2005 WL 445710, at *3 (Del. Super. Feb. 23, 2005); *Garber v. Whittaker*, 174 A. 34, 36 (Del. Super. 1934) ("As a general rule . . . where the action is based entirely on a breach of the terms of a contract between the parties . . . an action on the case will not lie, and the plaintiff must sue, if at all, in contract.").

[138] Pl.'s Answering Br. 78.

[139] *See Malca v. Rappi, Inc.*, 2021 WL 2044268, at *5 (Del. Ch. May 20, 2021) (ORDER); *Injective Labs Inc. v. Wang*, 2023 WL 3318477, at *7 (D. Del. May 9, 2023); *see also Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 889 (Del. Ch. Apr. 15, 2009) (explaining that where a claim "arises from a breach of contract, the plaintiff must sue in contract, and not in tort").

to be due to either as a result."[140] It is "generally limited to the context of fiduciaries acting as such."[141] Historically, accounting claims were also available in limited circumstances where the financial "accounts [were] so complex that [a] legal remedy [was] likely to prove inadequate."[142] Today, absent a fiduciary relationship, this court views such accountings to be a needless relic of the past given the breadth of modern discovery rules.[143]

Roth does not dispute the modern understanding that an equitable accounting remedy requires a fiduciary relationship. He argues instead that "for a significant duration of the relevant events, prior to Sotera's IPO, holders of [Class] B-2 units were limited partners of the company and . . . owed each other fiduciary duties."[144] But Roth's allegations concern only post-IPO events involving corporations that

---

[140] *Albert v. Alex. Brown Mgmt. Servs., Inc*., 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005).

[141] *Seiden v. Kaneko*, 2015 WL 7289338, at *15 (Del. Ch. Nov. 3, 2015); *see also Boxer v. Husky Oil Co*., 429 A.2d 995, 998 (Del. Ch. 1981) ("Numerous Delaware cases have established that a claim for an accounting from a fiduciary is properly made in the Court of Chancery.").

[142] *McMahon v. New Castle Assocs*., 532 A.2d 601, 605 (Del. Ch. 1987) (citing *Pomeroy's Equity Jurisprudence* § 1421 (1941)).

[143] *Id*; *see also Metro Ambulance, Inc. v. E. Med. Billing, Inc.*, 1995 WL 409015, at *3–4 (Del. Ch. July 5, 1995); *Int'l Bus. Machines Corp. v. Comdisco, Inc.*, 602 A.2d 78 (Del. Ch. July 2, 1991) ("The 'accounting' which [the plaintiff] seeks here appears to be merely the type of discovery . . . which in historic times comprised the auxiliary jurisdiction of the courts of equity but which is now readily available through the discovery rules of the law courts of this state."); *Ibach v. Dolle's Candyland, Inc*., 1991 WL 9980, at *10 (Del. Ch. Jan. 23, 1991).

[144] Pl.'s Answering Br. 78.

owed him no fiduciary duties.[145] Even if Roth's claims concerned the earlier period, both the Topco Parent LLC Agreement and the Topco Parent LP Agreement disclaimed fiduciary duties.[146] For these reasons, Count IV is inconsistent with Delaware law.

### 4. Declaratory Judgment

Provided there is a justiciable case or controversy, the Delaware Declaratory Judgment Act enables courts "to declare rights, status and other legal relations whether or not further relief is or could be claimed."[147] A declaratory judgment is most appropriate where "an impending injury has not as yet occurred."[148] Delaware courts also "frequently issue[] declaratory judgments as to present and future ownership based on past conduct or agreement."[149] Thus, the power to issue a declaratory judgment is a useful means to remedy a breach of contract claim.

Roth requests declaratory judgments regarding: (1) whether exchanging the partnership units for restricted stock "superseded in substance and effect the vesting and forfeiture terms" applied to the partnership units; (2) whether "there have been

---

[145] *See* Compl. ¶¶ 67-70; *cf. Gaffin v. Teledyne*, 611 A.2d 467, 472 (Del. 1992) (explaining that no fiduciary claims could lie where the only defendant was a corporate entity).

[146] Topco Parent LLC Agreement § 5.04(b); Topco Parent LP Agreement § 5.04(b).

[147] 10 *Del. C.* § 6501.

[148] *First State Orthopedics, P.A. v. Liberty Mut. Ins. Co.*, 2020 WL 6875219, at *4 (Del. Ch. Nov. 20, 2020) (citation omitted).

[149] *Malca*, 2021 WL 2044268, at *3.

sufficient payments to the Sponsors to trigger vesting"; (3) whether Sotera is "bound to provide accounting information regarding vesting"; and (4) whether Sotera could legally "constructive[ly] terminate" Roth, resulting in the forfeiture of his equity.[150] Since the claims for breach of contract and breach of implied covenant of good faith and fair dealing will proceed to trial, certain of these declarations may prove appropriate. I see no downside to allowing Count V to proceed alongside Counts I and II as a mechanism to determine Roth's rights, if merited.

## III.  CONCLUSION

Sotera's motion for summary judgment is granted on Count I in part. The Restricted Stock Agreement unambiguously incorporates the vesting and forfeiture conditions for unvested Class B-2 units and applies them to the associated restricted stock received by Roth. The Senior Management Agreement unambiguously conditions Roth's receipt of severance benefits on executing a general release, which condition is unmet. The motion for summary judgment is otherwise denied.

Sotera's motion for judgment on the pleadings is granted on Counts III and IV. It is denied on Counts II and V.

The parties are directed to jointly prepare a proposed order to implement this decision within ten days.

---

[150] Compl. ¶ 74.

35